UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

CHARTWELL RX, LLC,

                              Plaintiff,

                                                          21-cv-2185 (PKC)

                -against-

                                                          OPINION AND ORDER

INMAR, INC. and INMAR RX SOLUTIONS,
INC.,

                              Defendants.

-------------------------------------------------------------x

CASTEL, U.S.D.J.

            Plaintiff Chartwell RX, LLC ("Chartwell") is a manufacturer of pharmaceutical

products that sells its products to distributors throughout the United States.  (Fourth Amended

Complaint ("FAC") ¶ 31.)  Non-parties Amerisource Bergen Corp. ("ABC"), Cardinal Health,

Inc. ("Cardinal"), and McKesson Corp. ("McKesson") (collectively, the "Distributors") are

prominent pharmaceutical distributors that have distribution contracts with Chartwell.  (FAC ¶¶

55, 136, 146, 156.)  Defendant Inmar Rx Solutions, Inc. ("Inmar Rx"), an indirect subsidiary of

defendant Inmar, Inc. (collectively, "Inmar"), is a reverse distributor of pharmaceutical products,

processing expired or near-expired pharmaceutical products from distributors and dispensers[1]

and returning them to the products' manufacturers on behalf of the distributors and dispensers.

(FAC ¶¶ 38-39.)  Inmar has entered into written agreements with, and provides reverse

distribution services to the Distributors, in addition to other distributors and dispensers across the

United States.  (FAC ¶¶ 38-39, 56-57, 183-84.)

---

[1] Dispensers, like pharmacies and retailers, purchase pharmaceutical products from distributors and sell the drugs to
the general public.  (FAC ¶¶ 32-33.)

Chartwell alleges that Inmar has acted inappropriately in providing reverse distribution services to various distributors and dispensers, including the Distributors, who claim credit for pharmaceutical returns after relying on Inmar's notifications of processed returns and available credit.  Specifically, Chartwell alleges that Inmar has (1) repeatedly and willfully sent unacceptable returns of pharmaceutical products to Chartwell in violation of Chartwell's policies and (2) knowingly misrepresented Chartwell's acceptance of such faulty returns to distributors and dispensers by incorrectly indicating that they were entitled to credit for the returns, resulting in improper debits to Chartwell.  Chartwell alleges that Inmar benefits from these misrepresentations both through compensation per returns processed and offloading of unauthorized pharmaceutical products at Chartwell's facilities at Chartwell's expense.  (FAC ¶¶ 45, 58-80, 128-29, 132.)

Chartwell brings seven state law claims against Inmar: fraud, unjust enrichment, three claims for tortious interference with contract as to its contracts with ABC, Cardinal and McKesson, respectively, unfair competition and breach of contract as an alleged third-party beneficiary to the contracts between Inmar and the Distributors.  Inmar now moves under Rule 12(b)(6), Fed. R. Civ. P. for dismissal of Chartwell's claims.  (Doc 60.)

As will be explained, in viewing the FAC's factual allegations in the light most favorable to non-movant Chartwell and drawing all reasonable inferences in favor of Chartwell, the Court concludes that Chartwell has plausibly pleaded a claim for relief as to its claims for (1) unjust enrichment relating to returns shipped on behalf of distributors and dispensers who do not have distribution contracts with Chartwell; and (2) tortious interference with its contracts with ABC, Cardinal and McKesson.  The Court concludes that Chartwell has failed to plausibly plead

a claim for relief as to its claims for fraud, unfair competition, and breach of contract as a third-party beneficiary.  Inmar's motion to dismiss will be granted in part and denied in part.

BACKGROUND

The Court summarizes the Fourth Amended Complaint's factual allegations, and, for the purposes of the motion, accepts them as true, drawing all reasonable factual inferences in favor of the plaintiff as the non-movant.  In re Hain Celestial Grp., Inc. Sec. Litig., 20 F.4th 131, 133 (2d Cir. 2021).

    A.    The Pharmaceutical Industry and Reverse Distribution

Historically, the pharmaceutical industry in the United States has consisted primarily of three types of companies: manufacturers (such as Chartwell), distributors (such as ABC, Cardinal and McKesson), and dispensers (such as pharmacies and retailers).  (FAC ¶ 33.)  Due to the nature of the pharmaceutical industry, pharmaceutical goods produced by manufacturers are generally unsellable within six months of their expiry date (a condition also known as being "short date") and unusable after their expiration date.  And once expired, pharmaceutical goods are costly to dispose of due to the regulatory regime governing prescription drugs.  (FAC ¶ 34.)  Over time, drug manufacturers such as Chartwell began developing and implementing rules and eligibility requirements for distributors and dispensers to return unused expired or short date pharmaceutical goods for a refund or credit, a process known as reverse distribution.  (FAC ¶ 35.)

In the 1980s and 1990s, due to the logistical strain that reverse distribution placed on distributors and dispensers, reverse distribution companies, also known as third-party returns processors, were created to facilitate the return and credit processes for distributors and dispensers.  (FAC ¶ 36.)  Put another way, reverse distribution companies act as the middlemen

to streamline the process of: (1) returning pharmaceutical goods that are eligible for credit under the respective manufacturers' policies; (2) capturing the credit due for the return; and (3) disposing of the pharmaceutical goods ineligible for credit.  (FAC ¶ 37.)  No matter who hires the reverse distribution company, the reverse distribution company's primary purpose is to process returns in compliance with the respective manufacturer's policies to properly obtain credits for the distributor or dispenser that hired the reverse distribution company, and then dispose of unreturnable products in compliance with applicable laws.  (FAC ¶ 39.)

      B.    <u>The Parties</u>

The Distributors—ABC, Cardinal, and McKesson—are the three largest pharmaceutical distributors in the United States and have valid contracts with Chartwell which provide for reverse distribution of drugs back to Chartwell. (FAC ¶¶ 55, 136-37, 146-47, 156.) Chartwell alleges that, pursuant to these valid contracts, the Distributors were required to ship drug returns in accordance with Chartwell's return policies.  (FAC ¶¶ 139, 149, 158, 184, 186.)

Inmar is a reverse distribution company that facilitates the return services for more than 50,000 pharmacies and 300 pharmaceutical manufacturers and distributors in the United States and Canada, including the Distributors.  Inmar advertises that it has a 99% overall accuracy rate in processing the returns—the industry's best.  (FAC ¶¶ 41-42.)  Inmar also markets its compliance with manufacturers' return policies and its ability to expedite and maximize clients' credits from pharmaceutical returns to manufacturers.  (FAC ¶ 43.) Specifically, Inmar advertises that it "continually update[s its] database of manufacturer return policies ensuring . . . the industry's most accurate information."  (FAC ¶ 119.)  Chartwell alleges that Inmar facilitates a significant majority of the Distributors' reverse distributions to Chartwell—as of September 28, 2021, Inmar provided 69% of Cardinal's returns to Chartwell,

94% of McKesson's returns to Chartwell, and 86% of ABC's returns to Chartwell.  (FAC ¶ 57.)

Chartwell also alleges that Inmar was aware of the terms and requirements of the contracts

between the Distributors and Chartwell during the relevant period.  (FAC ¶¶ 138-39, 148-49,

157-58.)

Chartwell, a pharmaceutical manufacturer, sells its pharmaceuticals directly at a

discounted rate to distributors like ABC, Cardinal and McKesson, who then resell the products to

dispensers like pharmacies at a marked-up cost.  (FAC ¶ 73.)  These dispensers then sell the

pharmaceutical products to the general public.  (FAC ¶ 32.)  Chartwell, in accordance with

industry standards, customer contracts and its own return policies, takes back full and unopened

bottles of drugs which are expired or short date.  (FAC ¶ 46.)  Chartwell, however, only accepts

returns from its direct customers—meaning only from its distributors, and not from dispensers or

members of the public who purchased drugs from dispensers.  (FAC ¶¶ 72-73.)

C.    Alleged Violations of Chartwell's Return Policies

Chartwell alleges that industry standards require that Inmar, as a third-party

processor, follow manufacturers' policies for returns of expired or short date pharmaceutical

goods.  (FAC ¶¶ 46-47.)  Chartwell has provided Inmar with copies of its return policies on

numerous occasions and as recently as November 9, 2020.  (FAC ¶ 52.)  Chartwell, however,

alleges that Inmar, in performing reverse distribution services for distributors and dispensers,

including ABC, Cardinal and McKesson, has repeatedly violated Chartwell's return policies in

various ways, such as by (1) improperly preparing and shipping returns, (2) inaccurately

notifying Inmar's clients of redeemable credit for faulty returns or (3) inappropriately shipping returns directly from dispensers, from whom Chartwell does not accept returns.

As to return logistics and credit for returns, Chartwell's policies emphasize the importance of first obtaining a valid return authorization from Chartwell before returning expired or short date drugs to Chartwell, and Chartwell's protocol of fully inspecting received returns prior to informing the relevant parties of the value of any credit Chartwell will issue in connection with the return.  These policies include the following:

a.   Customers or their designated third party returns processor must send a written request to Chartwell for a return authorization;

b.   Upon receipt of a request, Chartwell will evaluate the request and issue either a return authorization number covering return of goods all or in part, or a denial; Chartwell will also issue an internal valuation for each piece accepted to be returned, based on actual customer purchase prices.  This valuation may or may not be the same as the customer claim[;]

c.   The return authorization number and accompanying paperwork are emailed to the requesting party to start the return, including instructions on which units are accepted for return and on where to return the product; accordingly, if the return is denied, the parties are also sent an email specifying as to why; and

d.   After receipt of the returned merchandise at Chartwell's warehouse is verified, counted and valued, Chartwell will send the requesting party an updated reconciliation with a specific listing of which units will be accepted, which units will be denied and the value of the credit to be issued by Chartwell.

(FAC ¶ 48.)  Significantly, Chartwell's policies state that: (1) credit will only be considered for items specifically listed in the return authorization issued for a given return shipment, which is valid for thirty days from the date issued; (2) no credit will be issued until the products are physically returned to Chartwell; and (3) no credits will be received for products received after

thirty days from issuance of the return authorization for a given return shipment.  (FAC ¶¶ 49-51.)

Chartwell alleges that despite being aware of Chartwell's policies, Inmar has repeatedly failed to follow the protocols for shipping and incorrectly issues "Pharmaceutical Returns Debit Invoices" ("Debit Invoices") to Chartwell, even for improper returns denied by Chartwell.  (FAC ¶¶ 59-61.)  These Debit Invoices are often themselves faulty—missing important or verifiable information like expiration dates or proof of purchase from Chartwell, or inappropriately requesting partial returns.  (FAC ¶ 61.)  On the very same date that a Debit Invoice is sent to Chartwell, Inmar allegedly notifies its respective client of credit available for the at-issue return—if the client is a distributor, the distributor will issue a debit memo to Chartwell directly, while if the client is a dispenser, the dispenser will deduct its credit from its distributor, who will then issue a debit memo to Chartwell for the credit.  Chartwell, however, alleges that many of these Debit Invoices are issued for faulty returns—either unapproved or never received by Chartwell.  (FAC ¶¶ 62-65.)  Despite Chartwell's denials of faulty returns processed by Inmar, Inmar allegedly never reverses the credit notifications provided to dispensers and distributors, and Chartwell ends up footing the debits, as well as the costs for processing and disputing the unauthorized returns.  (FAC ¶¶ 66-67.)

Chartwell also alleges that Inmar improperly facilitates returns straight from dispensers to Chartwell, contrary to Chartwell's policy of accepting returns only from distributors who directly purchase drugs from Chartwell.  Because dispensers do not directly buy from Chartwell but from distributors instead at a mark-up, when Inmar processes debit invoices for dispenser returns, the credit amounts often exceed what Chartwell initially received for the drugs.  (FAC ¶¶ 73-75.)

Chartwell alleges that some 54% of returns to Chartwell processed by Inmar were in complete violation of Chartwell's return policies.  For the remaining 46% of Inmar-processed returns that were accepted in part or in full—meaning returns that were not complete violations—Inmar still claimed credits for its clients in the amount of $2,147,524, even though the total approved refund from Chartwell for these return claims was only $1,753,978.  (FAC ¶ 58.)  In contrast, out of all the Distributors' returns processed by different reverse distribution companies—also a sizeable number accounting for 31% of Cardinal's returns to Chartwell, 6% of McKesson's returns to Chartwell, and 14% of ABC's returns to Chartwell—only one return shipment was found to be in violation of Chartwell's return policies.  (FAC ¶ 57.)

Chartwell alleges that it has suffered various harms due to Inmar's failure to comply with its obligations, including: actual monetary loss, such as over $450,000 in improper debits for unauthorized returns; money and time costs of disputing improper returns, processing improper returns and disposing of received drugs; and strains on business relationships with distributors and dispensers with whom Chartwell must directly dispute and correct the improper debits.  (FAC ¶¶ 68-71.)

D.      Inmar's Alleged Misrepresentations and Intentions

Despite Chartwell's efforts and communications, Inmar has allegedly refused Chartwell's demands to abide by Chartwell's return policies.  (FAC ¶¶ 84-85.)  In Chartwell's communications with Inmar, which began in June 2020, an Inmar employee by the name of Leigh Blount responded on August 14, 2020 and stated that the problems Chartwell was experiencing were likely caused by Inmar's failure to internally set up Chartwell's return policies, after which Chartwell worked with Inmar to update Inmar's internal policy database for Chartwell's return policies.  (FAC ¶ 88-92.)  On August 25, 2020, Inmar, through Blount,

verified via e-mail that Chartwell's "policy ha[d] been updated" in Inmar's system."  (FAC ¶ 92.)

On October 1, 2020, after allegedly more improper Inmar return debits, Chartwell advised Blount via e-mail that the return issues were persisting even after the policy update, and asked to speak to someone who could assist, but Chartwell received no response.  (FAC ¶ 94.) Chartwell similarly received no response to similar requests for assistance sent on October 16, 2020 and October 20, 2020.  (FAC ¶¶ 95-96.)  After Chartwell again e-mailed Inmar on October 22, 2020, an Inmar employee named Lari Harding responded the same day, forwarding Chartwell's e-mail to another Inmar employee by the name of Christine Morris, who set up a call with Chartwell and Inmar for October 26, 2020.  (FAC ¶¶ 97-98.)

During the October 26, 2020 call, attended by Christine Morris and Lara Minnick from Inmar and three representatives from Chartwell, Inmar employees allegedly blamed Inmar's failure to follow Chartwell's return policies to internal Inmar issues such as COVID-related backlogs and reorganization of its warehouses.  (FAC ¶¶ 99-100.)  During the call, Inmar employees also allegedly indicated that Inmar would be more likely to follow Chartwell's policies if Chartwell were a direct customer of Inmar.  (FAC ¶ 101.)  On October 27, 2020, Morris stated that Inmar's database would be updated to accurately reflect and adhere to Chartwell's return policies.  (FAC ¶ 116.)  On November 3, 2020, Morris stated that after resolving a processing backlog, Inmar was hoping to get into a "long-term steady state."  (FAC ¶ 106.)

Chartwell, however, alleges that when Inmar stated that it had updated Chartwell's return policies in Inmar's database, Inmar actually knew and neglected to mention that it would not honor the policies and that it would continue to issue improper debits and

unauthorized credits.  (FAC ¶ 110.)  Chartwell alleges that after justifiably relying on Inmar's representations that it would start to adhere to Chartwell's return policies, Chartwell did not impose upward price adjustments to drugs sold to the Distributors; Chartwell alleges that had it known that Inmar would continue to improperly ship and process returns to Chartwell, it would have charged more to the Distributors to help absorb the cost burdens imposed on Chartwell by Inmar's violations.  (FAC ¶¶ 117-120.)

Chartwell alleges that Inmar is, in essence, "bullying Chartwell into becoming an Inmar customer" (FAC ¶ 123) by suggesting that the persistent stream of improper returns—created by Inmar itself—will only stop once Chartwell becomes Inmar's client, instead of processing Chartwell's reverse distribution returns independently and in-house.  (FAC ¶¶ 79-82, 86.)  In so alleging, Chartwell points to occasions when Inmar suggested that the unauthorized debits and improper credits would have a better chance of being resolved if Chartwell became Inmar's direct customer instead of continuing to process its own returns independently and in competition with Inmar.  (FAC ¶¶ 86, 101.)  Chartwell also notes that Christina Robinson, Senior Client Development Manager for Inmar, reached out to Chartwell at least nine times to set up a sales call, at one point suggesting that Inmar could "minimiz[e] the cost of [Chartwell's] overall returns program."  (FAC ¶¶ 107, 109.)  In supporting its allegations of "bullying" and high-handed behavior by Inmar, Chartwell emphasizes Inmar's market power, noting that Inmar provides reverse distribution services for seventeen of the top twenty pharmaceutical manufacturers in the United States.  (FAC ¶ 81, 123.)

RULE 12(B)(6) STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court

assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the

Court must examine only the well-pleaded factual allegations, if any, "and then determine

whether they plausibly give rise to an entitlement to relief."  Id. at 679.  A complaint must

include non-conclusory factual allegations that "'nudge[]'" its claims "'across the line from

conceivable to plausible.'"  Id. at 680 (quoting Twombly, 550 U.S. at 570).  In addition to a

complaint's allegations, a court "may consider any written instrument attached to the complaint,

statements or documents incorporated into the complaint by reference, legally required public

disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff

and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493

F.3d 87, 98 (2d Cir. 2007).

DISCUSSION

          The Court must first determine the applicable law governing the claims in this

action invoking the Court's diversity jurisdiction.[2]  In determining choice-of-law, "a federal

court sitting in diversity jurisdiction applies the choice of law rules of the forum state," here,

New York.  AEI Life LLC v. Lincoln Benefit Life Co., 892 F.3d 126, 132 (2d Cir. 2018).  Under

New York's choice-of-law rules, where the parties' briefs assume that a given state's law

controls, "such implied consent . . . is sufficient to establish choice of law."  Chau v. Lewis, 771

F.3d 118, 126 (2d Cir. 2014) (citation omitted).  As also relevant here, "[u]nder New York law,

---

[2] Chartwell is a limited liability company organized and existing under the laws of the State of New York, with its principal place of business in the State of New York.  Chartwell's sole member is Jack Goldenberg, who is domiciled in New York and is a citizen of New York.  (FAC ¶¶ 1-6.)  Inmar, Inc. is a company incorporated in the State of North Carolina with its principal place of business in the State of North Carolina.  Inmar Rx is a company incorporated in the State of Texas with its principal place of business in the State of North Carolina.  (FAC ¶¶ 9, 11.)

'courts will generally enforce choice-of-law clauses,' . . . because 'contracts should be interpreted so as to effectuate the parties' intent.'"  Id. (quoting Ministers & Missionaries Benefit Bd. v. Snow, 26 N.Y.3d 466, 470 (2015)).  "While there is no magical incantation that parties must utter . . . the clause must clearly manifest the parties' intent to be governed by the laws of a particular jurisdiction."  Id. (citing Welsbach Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y.3d 624, 629 (2006)).

Here, the parties do not dispute that New York law applies to Chartwell's claims for fraud, unjust enrichment, tortious interference with a contract, and unfair competition (Inmar Br. at 3 n.2), and the Court concludes that the parties' implied consent is sufficient to establish New York law as the applicable law for these claims.

As to the third-party beneficiary contract claim, the parties appear to dispute which state's law applies.  Chartwell argues New York law applies to the claim.  (Id.; Chartwell Br. at 23-25.)  Inmar, relying on choice-of-law provisions contained in the agreements between Inmar Rx and the Distributors ABC, Cardinal and McKesson, argues that Delaware law applies to the claim as to Inmar Rx's contracts with ABC and McKesson and Texas law applies to the claim as to Inmar Rx's contract with Cardinal.  (Inmar Br. at 21-23 (citing Hunter Decl. ¶¶ 5-6, 8, 12.).)  The Court has reviewed the sworn declarations of Susan Hunter, a member of Inmar, Inc.'s legal department who is also responsible for contract management at Inmar Rx.  The Court has also reviewed the choice-of-law provisions excerpted from Inmar Rx's agreements with the Distributors and concludes that the choice-of-law provisions clearly manifest Inmar Rx and the Distributors' intent to have disputes regarding their contracts be governed by the laws of Delaware and Texas, respectively.  Accordingly, the Court concludes that for Chartwell's third-

party beneficiary contract claim, Delaware law applies as to Inmar Rx's contracts with ABC and McKesson and Texas law applies as to Inmar Rx's contract with Cardinal.

> A.  <u>Fraud</u>

The Court concludes that Chartwell has failed to plead a plausible fraud claim against Inmar.

> i.  <u>Applicable Law</u>

Under New York law, "[t]he elements of a fraud cause of action consist of [1] 'a misrepresentation or a material omission of fact [2] which was false and known to be false by [the] defendant, [3] made for the purpose of inducing the other party to rely upon it, [4] justifiable reliance of the other party on the misrepresentation or material omission, and [5] injury.'" <u>Pasternack v. Lab'y. Corp. of Am. Holdings</u>, 27 N.Y.3d 817, 827 (2016).

As to fraud by omission of a material fact, a plaintiff must also allege that the defendant "had a duty to disclose material information" to the plaintiff.  <u>Gansett One LLC v. Husch Blackwell, LLP</u>, 168 A.D.3d 579, 579 (1st Dep't 2019) (citing <u>Mandarin Trading Ltd. v. Wildenstein</u>, 16 N.Y.3d 173, 179 (2011)).  <u>See</u> <u>also</u> <u>Nasaba Corp. v. Harfred Realty Corp.</u>, 287 N.Y. 290, 295 (1942) ("Concealment with intent to defraud of facts which one is duty-bound in honesty to disclose is of the same legal effect and significance as affirmative misrepresentations of fact.").

"A duty to disclose arises in one of three circumstances: [1] where the parties are in a fiduciary relationship; [2] under the 'special facts doctrine,' where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge . . . [3] or where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure."  <u>Aetna Cas & Sur. Co. v.</u>

Aniero Concrete Co., 404 F.3d 566, 582 (2d Cir. 2005) (citations and internal quotation marks

omitted).  As to the special facts doctrine, "concealment of opinions" is distinct from the

"concealment of the facts," upon which opinions may be based.  SSA Holdings LLC v. Kaplan,

120 A.D.3d 1111, 1111 (1st Dep't 2014).  See also First Hill Partners, LLC v. BlueCrest Cap.

Mgmt. Ltd., 52 F. Supp. 3d 625, 638 (S.D.N.Y. 2014) ("[K]nowledge of intention is not

knowledge of *facts*, and certainly not the kind of facts required under the special facts doctrine."

(emphasis in original)).  Furthermore, the special facts doctrine "applies only in 'business

dealings' between parties to a prospective transaction."  Merkin v. Berman, 123 A.D.3d 523, 524

(1st Dep't 2014) (citation omitted).

   Additionally, a fraud plaintiff "must satisfy the heightened pleading standard set

forth in Rule 9(b), which reads: 'In alleging fraud or mistake, a party must state with particularity

the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions

of a mind may be alleged generally.'"  Loreley Fin. (Jersey) No. 3 Ltd. V. Wells Fargo Secs.,

LLC, 797 F.3d 160, 171 (2d Cir. 2015) (citing Rule 9(b), Fed. R. Civ. P.).  "In essence, Rule 9(b)

places two further burdens on fraud plaintiffs—the first goes to the pleading of the circumstances

of the fraud, the second to the pleading of the defendant's mental state."  Id.

   First, as to the circumstances of the fraud, the complaint must "(1) detail the

statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3)

state where and when the statements (or omissions) were made, and (4) explain why the

statements (or omissions) are fraudulent."  Id. (quoting Eternity Glob. Master Fund Ltd. v.

Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004)).

   Second, as to the required scienter for fraud claims under New York law, meaning

(1) the defendant's knowledge of their misstatements or omission's falsity and (2) the

defendant's intent to induce reliance, id. at 176 (quoting Eurycleia Partners v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559 (2009)), while a plaintiff may allege them with generality, "this relaxation of the heightened pleading requirement is not to be mistaken 'for a license to base claims of fraud on speculation and conclusory allegations.'"  Id. (quoting Lerner v. Fleet Bank, 459 F.3d 273, 290 (2d Cir. 2006)).  Rather, a fraud plaintiff "must state facts sufficient to 'give rise to a strong inference of fraudulent intent.'"  Id.  An inference of fraudulent intent is "'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  Id. (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007)).  In determining whether a plaintiff has satisfied the strength-of-inference requirement, the Court considers "the complaint in its entirety" and "take[s] into account plausible opposing inferences."  Id. (quoting Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 106 (2d Cir. 2015)).

Finally, "[w]here a plaintiff alleges both a breach of contract and a fraud claim arising from the same series of events, New York courts have been cautious in sustaining an independent fraud claim."  In re Fyre Festival Litigation, 399 F. Supp. 3d 203, 212 (S.D.N.Y. 2019) (citations omitted).  A fraud claim, however, is not duplicative of a breach of contract claim if "they allege misrepresentations and omissions that are 'other fraudulent conduct besides entering the contract with no intention to perform.'"  Id. (citing Grappo v. Alitalia Linee Aeree Italiane, S.p.A., 56 F.3d 427, 434 (2d Cir. 1995).

      ii.    Application

Chartwell's argument for establishing its fraud claim proceeds as follows.  First, in response to Chartwell's complaints about Inmar's failure to follow Chartwell's return policies, Inmar suggested that the cause of the problem was a logistical backlog on Inmar's end and a database with incorrect policies for Chartwell, and subsequently confirmed that Inmar had

15

resolved the logistical backlog and updated its database.  Second, in so confirming, Inmar purposefully omitted that Inmar intended to continue violating Chartwell's policies.  Third, Chartwell reasonably relied on the implication that Inmar would start following Chartwell's return policies after the resolution of the logistical backlog and the database update by refraining from charging the Distributors more for Chartwell's drugs, which would have helped absorb the costs of future violations by Inmar.  Fourth, Chartwell was consequently injured because it in fact had to absorb the costs of continued policy violations by Inmar, without the additional revenue it would have generated had it increased drug prices on the Distributors.  (FAC ¶¶ 87-126; Chartwell Br. at 18.)

As an initial matter, the Court concludes that because this alleged fraudulent conduct is separate from "entering [a] contract with no intention to perform," Chartwell's fraud claim is not duplicative of its breach of contract claim.  See In re Fyre Festival Litigation, 399 F. Supp. 3d at 212 (citing Grappo v. Alitalia Linee Aeree Italiane, S.p.A., 56 F.3d 427, 434 (2d Cir. 1995)).

The Court also concludes that Chartwell's fraud claim rests on the material omission theory of fraud, as opposed to the misrepresentation theory.  Chartwell does not challenge the veracity of whether Inmar's database initially had incorrect policies for Chartwell, or whether Inmar had been experiencing a logistical backlog, as cited by Inmar for contributing to the improper returns sent to Chartwell.  Nor does Chartwell challenge Inmar's confirmations that Inmar had updated its policies for Chartwell and that it had made substantial progress through its backlog by November 2020.  According to the FAC, what Chartwell alleges is that Inmar failed to disclose material information—namely, of Inmar's alleged plan to continue violating Chartwell's return policies.  Put another way, Chartwell does not accuse Inmar of

16

affirmatively making a false statement but rather harboring an undisclosed intent to continue submitting faulty returns, with which Inmar hoped to "bully" Chartwell into becoming its client.

Chartwell's alleged facts, however, do not satisfy the requirements of pleading fraud by omission.  Chartwell fails to allege, as required, that Inmar "had a duty to disclose material information" to Chartwell.  Gansett, 168 A.D.3d at 579.  As noted, a duty to disclose arises if (1) the parties are in a fiduciary relationship, (2) if the special facts doctrine applies or (3) where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure.  The parties are not in fiduciary relationship, ruling out the first basis.  The parties do not contest whether Inmar made a partial or ambiguous statement, and the Court also concludes that the allegations do not involve an affirmative statement that was partial or ambiguous.  The statements, such as Inmar's claim that it updated its policies for Chartwell and that it had been working through a logistical backlog, are complete and unambiguous and rule out the third basis for establishing a duty to disclose.

The FAC's allegations also do not satisfy the requirements of the special facts doctrine.  First, it is unclear whether the alleged intention to keep violating Chartwell's return policies is a fact or an opinion.  See First Hill Partners, 52 F. Supp. 3d at 638 ("[K]nowledge of intention is not knowledge of *facts*, and certainly not the kind of facts required under the special facts doctrine." (emphasis in original)); SSA Holdings LLC v. Kaplan, 120 A.D.3d 1111, 1111 (1st Dep't 2014) (distinguishing "concealment of opinions" from the "concealment of the facts" which may form the basis of opinions).  If the withheld intention is an opinion, the special *facts* doctrine would not apply.  Even assuming that the withheld intention regarding Inmar's future course of action is a fact, the special facts doctrine "applies only in 'business dealings' between parties to a prospective transaction.'"  Merkin, 123 A.D.3d at 524.  There was no prospective

transaction here.  As Chartwell itself emphasizes, "[t]he FAC is clear that Chartwell was

contacting Inmar for the *sole purpose* of 'explain[ing] Chartwell's frustrations with Inmar's

business practices, as well as Inmar's failure to follow Chartwell's return policies.'"  (Chartwell

Br. at 14 (emphasis in original) (quoting FAC ¶ 88).)

        Separate from the requirements for pleading fraud by omission, Chartwell also

fails to satisfy the Rule 9(b) requirement that a fraud plaintiff "must state facts sufficient to 'give

rise to a strong inference of fraudulent intent.'"  Loreley, 797 F.3d at 176.  To be "strong," the

inference of fraudulent must be as cogent and compelling as plausible opposing inferences.  Id.

at 177.

        As to Inmar's inferred fraudulent intent, Chartwell alleges, in essence, that Inmar

wanted to torment Chartwell into becoming its client with a torrent of faulty pharmaceutical

returns.  But even drawing all reasonable inferences in favor of Chartwell and accepting all non-

conclusory factual allegations, no facts are alleged that make it plausible that Inmar believed it

could "bully" Chartwell into becoming its client.  As Chartwell itself alleges to meet the reliance

and injury prongs of a New York fraud claim, Chartwell undoubtedly had, and continues to have

the power to increase its prices on its distributors, including the three Distributors.  Significantly,

as alleged by Chartwell itself, Inmar not only knew of the contractual relationship and

requirements between Chartwell and its distributors, but also did business itself with many of

these distributors.  These distributors then, including the Distributors, could pass on any

increased costs from Chartwell downstream to their business partners, including Inmar.  The

FAC does not plausibly allege that Inmar was unaware of this business reality, especially as a

prominent reverse distribution company doing business with many of the largest pharmaceutical

manufacturers in the United States.

Chartwell's proffered inference of Inmar's fraudulent intent, then, is not cogent and compelling, especially when compared to plausible opposing inferences applicable here, such as the much more straightforward possibility that Inmar was still struggling logistically a just few months after revealing to Chartwell that it had issues with a processing backlog and movement of warehouses.  As alleged by Chartwell itself, Inmar, in trying to explain the faulty returns flagged by Chartwell, cited not only its outdated policy database but also its "processing backlog due to multiple facility moves and COVID."  (FAC ¶ 106.)  According to the FAC, even as of November 3, 2020, Inmar "ha[d] to work through" a "sort/ship" issue "to *get into* a long-term steady state," implying that it had not yet resolved the logistical issues and had not gotten into a "long-term steady state."  (Id.)  The Court therefore concludes that Chartwell has failed to adequately and plausibly allege scienter, which serves as an alternative and independent basis for foreclosing Chartwell's fraud claim.

Accordingly, the Court concludes that Chartwell has failed plead a plausible fraud claim against Inmar.  The motion to dismiss Chartwell's fraud claim will be granted.

B.      Unjust Enrichment

The Court concludes that Chartwell has pleaded a plausible claim for relief on its unjust enrichment claim only as to Inmar's faulty returns on behalf of distributors and dispensers with whom Chartwell has not contracted.

i.      Applicable Law

Under New York law, "in order to sustain an unjust enrichment claim, '[a] plaintiff must show that (1) the other party was enriched, (2) at [the plaintiff's] expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'"  E.J. Brooks Co. v. Cambridge Sec. Seals, 31 N.Y.3d 441, 455 (2018) (quoting

Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (2011)).  This doctrine, however, "is a narrow one . . . 'not a catchall cause of action to be used when others fail.'" Id. (quoting Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2012)).  "Unjust enrichment, or an action in quasi-contract, 'is available only in unusual situations when, though the defendant has not breached a contract or committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Id. (quoting Corsello, 18 N.Y.3d at 790).

      ii.    Application

Under New York law, "the existence of a valid contract governing the subject matter generally precludes recovery in quasi contract for events arising out of the same subject matter." EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 23 (2005) (citing Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987)).  See also In re First Cent. Fin. Corp., 377 F.3d 209, 213 (2d Cir. 2004) ("recogniz[ing] this rule as one of the 'well-settled principles of New York law'"); Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561, 572 (2005) ("[T]here was no unjust enrichment because the matter is controlled by contract." (citing Clark-Fitzpatrick, 70 N.Y.2d at 388)).

There is disagreement in this district on how broadly to interpret Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987), which established this general rule, as well as New York Appellate Division cases applying Clark-Fitzpatrick.  For example, some judges in this district have interpreted New York law to categorically preclude such quasi-contract claims, even when a non-signatory to the related contract is a party to the claim.  See, e.g., Mueller v. Michael Janssen Gallery Pte. Ltd., 225 F. Supp.3d 201, 207 (S.D.N.Y. 2016) (collecting cases).  Others have more narrowly construed Clark-Fitzpatrick to only preclude quasi contract claims between the signatories of the related contract.  See, e.g.,

Seiden Assocs., Inc. v. ANC Holdings, Inc., 754 F. Supp. 37, 39 (S.D.N.Y. 1991); Lee v. Kylin Mgmt. LLC, 17-CV-7249 (JMF), 2019 WL 917097, at *2 (S.D.N.Y. Feb. 25, 2019).

Here, Inmar is not a party to the contracts between Chartwell and its distributors addressing reversing distribution of pharmaceuticals back to Chartwell.  The New York Court of Appeals has not explicitly held that this preclusive principle applies to quasi contract claims involving a litigant who is not a party to the valid contract governing the same subject matter.

The Court does not purport to decide the full parameters of when quasi-contract claims are permissible against a non-party to a contract.  For present purposes, it suffices to conclude that Chartwell's contracts with distributors containing reverse distribution provisions preclude the quasi contract claim as to reverse distribution done on behalf of these contracting distributors.  These claims are precluded because the subject matter of the quasi contract claim against Inmar is the same subject matter of these contracts.  In contrast, Chartwell's claims against Inmar relating to distributors who have no contracts with Chartwell stand at the motion to dismiss stage because there is no contract with these distributors on the subject matter of reverse distribution from these non-contracting distributors and dispensers back to Chartwell.

The New York Court of Appeals appears to favor construing the "subject matter" of a contract with some particularity and focusing on whether the parties on opposite sides of a quasi contract claim have executed a valid contract governing the same subject matter.  In IDT Corp. v. Morgan Stanley Dean Witter & Co, 12 N.Y.3d 132 (2009), the New York Court of Appeals held that "where the parties executed a valid and enforceable written contract governing a *particular* subject matter, recovery on a theory of unjust enrichment for events arising out of *that* subject matter is ordinarily precluded."  Id. at 142 (emphases added) (citing to Clark-Fitzpatrick, 70 N.Y.2d at 388).  See also Cox v. NAP Constr. Co., Inc., 10 N.Y.3d 592, 607

(2008) ("[A] party may not recover in quantum meruit or unjust enrichment where *the parties have entered into a contract* that governs *the* subject matter." (emphases added) (citing <u>Clark-Fitzpatrick</u>, 70 N.Y.2d at 388)).

The Court rejects defining the subject matter of the contracts as broadly as to encompass all reverse distribution of pharmaceuticals back to Chartwell, regardless of which entity is sending the drugs back to Chartwell.  Rather, it is more accurate and precise to define the subject matter as reverse distribution back to Chartwell from Chartwell's distributors, including the three Distributors ABC, Cardinal and McKesson.  Thus, Chartwell's unjust enrichment claim against Inmar based upon Inmar's faulty returns on behalf of entities that do not have contracts with Chartwell governing reverse distribution are not precluded.  But those claims of Chartwell relating to reverse distribution by distributors who do have contracts with Chartwell governing reverse distribution—such as the three Distributors—are foreclosed.

As alleged, Inmar is "enriched" for every improper return shipment sent to Chartwell, which Chartwell must process and dispose of at its expense.  Drawing all reasonable inferences in its favor, Chartwell has plausibly alleged facts that show that it would be "against equity and good conscience" for Inmar to continue financially benefitting from (1) shipping unsellable and unusable pharmaceutical products to Chartwell and (2) notifying its clients to seek credits for successfully "returning" products to a company that its clients never contracted to purchase pharmaceuticals from.  <u>E.J. Brooks</u>, 31 N.Y.3d at 455.  As applied to Inmar's alleged returns for distributors and dispensers who have not contracted with Chartwell, an unjust enrichment claim would not "simply duplicate[ ], or replace[ ], a conventional contract or tort claim."  <u>Corsello v. Verizon N.Y., Inc.</u>, 18 N.Y.3d 777, 740 (2012).

The motion to dismiss the unjust enrichment claim will therefore be granted as to distributors with whom Chartwell has contracted regarding reverse distribution and denied as to distributors and dispensers with whom Chartwell has not contracted regarding reverse distribution.

C.   Tortious Interference with a Contract

The Court concludes that Chartwell has pleaded a plausible claim for relief as to its claims for tortious interference with a contract.

i.   Applicable Law

"Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996)).

ii.   Application

Here, Chartwell alleges that (1) there are valid contracts between Chartwell and the Distributors ABC, Cardinal and McKesson; (2) Inmar was aware of these contracts; (3) Inmar intentionally and successfully induced the Distributors into breaching their contracts with Chartwell by issuing unauthorized credit notifications to the Distributors, which caused the Distributors to improperly debit Chartwell's account for improper returns in breach of their contracts with Chartwell; and (4) Chartwell suffered damages as a result of the improper debits, including the costs of processing and contesting the improper returns and debits and physically disposing of improperly returned pharmaceuticals.  (FAC ¶¶ 135-163.)

Inmar argues that it would be counterproductive (and therefore implausible) for Inmar to intentionally induce the Distributors to breach their contracts with Chartwell, inevitably risking termination of the Distributors' business relationships with Chartwell and Inmar's own reverse distribution services to the Distributors.  (Inmar Reply Br. at 6.)  But the Court concludes that the claim is plausibly alleged and that Inmar could rationally decide that the risk of termination of the Distributors' contracts was low in relation to the potential revenue gained by Inmar.

Accepting the FAC's non-conclusory factual allegations as true and drawing all reasonable inferences in favor of Chartwell, the Court concludes that Chartwell has plausibly pleaded a claim for relief as to its three claims of tortious interferences with a contract. Accordingly, the motion to dismiss will be denied as to the three claims of tortious interference with a contract relating to Chartwell's contracts with the Distributors ABC, Cardinal and McKesson.

D.    Unfair Competition

The Court concludes that Chartwell has failed to plead a plausible claim for relief as to its unfair competition claim.

i.    Applicable Law

New York courts recognize two theories of common-law unfair competition claims: (1) "palming off" and (2) misappropriation.  ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467, 476 (2007).  "Palming off" concerns the sale of the goods of one manufacturer as those of another and applies even where the plaintiff and defendant are not in competition with another. Id.  Under the misappropriation theory, a party is liable if they unfairly exploit "the skill, expenditures and labors" of a competitor.  E.J. Brooks, 31 N.Y.3d at 449 (quoting ITC, 9 N.Y.3d

24

at 476-77).  "The essence of the misappropriation theory is not just that the defendant has 'reap[ed] where it has not sown,' but that it has done so in an unethical way and thereby neutralized a commercial advantage that the plaintiff achieved through 'honest labor.'"  Id. (quoting Int'l News Serv. v. Assoc. Press, 248 U.S. 215, 236 (1918)).

        ii.    Application

As to the "palming off" theory of unfair competition, although the claim is available even where the "plaintiff and defendant are not in competition with another," ITC Ltd., 9 N.Y.3d at 476, as alleged in the FAC, Inmar is not engaging in "the sale of goods of one manufacturer as those of another."  Id.  As alleged and challenged by Chartwell, Inmar's conduct involves the provision of reverse distribution services for previously sold pharmaceuticals from various distributors and dispensers back to the drugs' manufacturers.  While Chartwell alleges that Inmar engages in various misconduct in performing these services, such as failing to follow Chartwell's return policies, Chartwell's own allegations highlight that Inmar's alleged misconduct entails the shipping and processing of previously sold goods to Chartwell, not the sale of goods.  Accordingly, Chartwell has failed to plausibly plead an unfair competition under the "palming off" theory.

As to the misappropriation theory, a plaintiff must allege that the defendant has "unfairly exploit[ed] 'the skill, expenditures and labors; of a *competitor*."  E.J. Brooks, 31 N.Y.3d at 449 (emphasis added) (quoting ITC, 9 N.Y.3d at 476-77).  Inmar, a reverse distribution company, does not compete with Chartwell, a manufacturer of pharmaceuticals. Indeed, Chartwell itself alleges that Inmar is on a mission to bully Chartwell into Inmar's clientele, which includes seventeen other pharmaceutical manufacturers in the United States.

Accordingly, Chartwell has failed to plausibly plead an unfair competition under the misappropriation theory.

Inmar's motion to dismiss will be granted as to the unfair competition claim.

E.     Third-Party Beneficiary Breach of Contract

The Court concludes that Chartwell has failed to plead a plausible third-party beneficiary of contract claim.

i.      Applicable Law

As noted, for Chartwell's third-party beneficiary contract claim, Delaware law applies as to Inmar's contracts with ABC and McKesson and Texas law applies as to Inmar's contract with Cardinal.

"According to Delaware law . . . 'to qualify as a third party beneficiary of a contract, (a) the contracting parties must have intended that the third party beneficiary benefit from the contract, (b) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (c) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract." In re Stone & Webster, Inc., 558 F.3d 234, 241 (3d Cir. 2009). "Essential to a third party's right of enforceability is the intention of the contracting parties to view that party as either a donee or creditor beneficiary." Triple C Railcar Serv., Inc. v. City of Wilmington, 630 A.2d 629, 633 (Del. 1993).

Similarly, under Texas law, "a person seeking to establish third-party-beneficiary status must demonstrate that the contracting parties 'intended to secure a benefit to that third party' and 'entered into the contract directly for the third party's benefit.'" First Bank v. Brumitt, 519 S.W.3d 95, 102 (Tex. 2017) (quoting Stine v. Stewart, 80 S.W.3d 586, 589 (Tex. 2002). "It is not enough that the third party would benefit—whether directly or indirectly—from

26

the parties' performance, or that the parties knew that the third party would benefit." Id. (citation

omitted).  In determining whether a contract created a third-party beneficiary, a court "begin[s]

with the presumption that the parties contracted solely for themselves, and only a clear

expression of the intent to create a third-party beneficiary can overcome that presumption." Id.

at 103 (internal quotation marks and citation omitted).

      ii.      <u>Application</u>

      In order to establish that Chartwell is a third-party beneficiary of the Distributors'

contracts with Inmar, Chartwell must allege facts showing that it is either a "creditor or donee

beneficiary" under the ABC and McKesson contracts to satisfy the applicable Delaware law

requirements, <u>In re Stone & Webster, Inc.</u>, 558 F.3d at 241, and that there was a "clear

expression of the intent to create a third-party beneficiary" in Chartwell, beyond mere knowledge

that Chartwell "would benefit—whether directly or indirectly—from the parties' performance"

to satisfy the applicable Texas law requirements, <u>First Bank</u>, 80 S.W.3d at 589.

      As alleged in the FAC, the valid and binding contracts between Inmar and ABC,

Cardinal and McKesson are "for Inmar to provide Reverse Distribution services to ABC,

Cardinal, and McKesson and their customers."  (FAC ¶¶ 182-83.)  Chartwell itself further alleges

that "the primary purpose of the Contracts between Inmar and the Distributors is to process

returns to the Distributors' manufacturers."  (Id. ¶ 187.)  In other words, while Chartwell alleges

that it is "an inherently third-party beneficiary of the Contracts" or that it is a "sufficiently

immediate third-party beneficiary" to the contracts (id. ¶¶ 189-90), Chartwell's own factual

allegations highlight that its contractual claim does not satisfy the requirements of Delaware and

Texas law: the "*entire* purpose" of the contracts between Inmar Rx and the Distributors is not "to

process returns of *Chartwell's* expired and short-term drugs that have been distributed by ABC,

Cardinal and McKesson and their customers." (Id. ¶ 191 (emphases added).)  Rather, the primary purpose of the contracts between Inmar and the Distributors is to facilitate reverse distribution to *all* manufacturers that the Distributors do business with, not just Chartwell. Chartwell also does not allege that these three contracts mention Chartwell specifically as a "creditor or donee beneficiary" for purposes of Delaware law or as a clearly indicated third-party beneficiary who would do more than just benefit from the parties' performance for purposes of Texas law.  Accordingly, the Court concludes that Chartwell has failed to plausibly plead a claim for relief as a third-party beneficiary of the contracts between Chartwell and the Distributors. The motion to dismiss will be granted as to the third-party breach of contract claim.

CONCLUSION

The Court has considered all the arguments of the parties, whether or not expressly referenced herein.  Inmar's motion to dismiss is (1) GRANTED as to the claims for fraud, unfair competition, and third-party beneficiary of contract; (2) GRANTED in part and DENIED in part as to the claim for unjust enrichment; and (3) DENIED as to the claims for tortious interference with a contract.

The Clerk is respectfully directed to terminate the motion (Doc 60).


SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        August 11, 2022